charge of the cargo by the crew would almost necessarily be interrupted.

The motives of the libellant in refusing to work are not shown. It does not appear what religion he professes, or even that he is a Christian. His refusal, therefore, cannot be attributed to scruples of conscience. He has chosen to stand on the purely legal ground that no work could be required of him on Sunday, except such as was clearly indispensable and necessary; and of this he constituted himself the judge.

My opinion is that the master had the right, under the circumstances, to require of him the performance of his duty. As the seaman, when the alternative was distinctly presented to him, chose to leave the vessel rather than go to work, he must be regarded as having abandoned the service, and he can have no claim for wages which by his own act he was prevented from earning. But, at the same time, I consider that the master's command to the seaman to go to work or to go ashore, was virtually an expulsion from the ship as a penalty or punishment for his refusal to do duty. Had the vessel been in a foreign port, this would have been clearly unlawful. It might even have exposed the master to a criminal prosecution. Ounalaska, though within our own territory, is remote and not much frequented. The seaman's refusal may have arisen from an honest mistake as to his rights and duties. I cannot affirm that conscientious scruples may not also have influenced him. His previous conduct had been good. He made no objection to performing his duty on any other day.

The master could have compelled him to work by appropriate punishment, or the threat of it, or he might have hired a man in his place, the expense of which, together with such deductions from his wages as the nature of his fault justified, could have been charged to the seaman. I think he had no right to expel him from the vessel, certainly he had none to inflict that mode of punishment which is only allowable in extreme cases, and to impose in addition a forfeiture of the wages already earned. I think, therefore, that the libellant is entitled to recover the wages due him at the time he left the vessel.

## Case No. 7,382.

### JOHNSON v. DAWS.

[5 Cranch, C. C. 283.][1]

District Court, District of Columbia. March Term, 1837.

Mr. Bradley, for defendant,

[1] [Reported by Hon. William Cranch, Chief Judge.]

Verdict for plaintiff.

## Case No. 7,383.

JOHNSON v. The ELIZA.

District Court, D. Massachusetts. Nov. Term, 1807.

## Case No. 7,384.

JOHNSON et al. v. FLUSHING & N. S. R. CO.

[15 Blatchf. 192; 3 Ban. & A. 428.] [1]

Circuit Court, E. D. New York. Aug. 27, 1878. [2]

Frederic H. Betts, for plaintiffs.

Hinsdale & Sprague, for defendants.

BENEDICT, District Judge. This action is brought to restrain the Flushing and North Side Railroad Company from using a certain fastening for their railroad rails, commonly known as the "fish-plate joint," upon the ground that the plaintiffs have the exclusive right to the use of such fastening, by virtue of a patent for an "improvement in fastening sheet metal to roofs," re-

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge; reprinted in 3 Ban. & A. 428, and here republished by permission.]

[2] [Affirmed in 105 U. S. 539.]

issued to Asa Johnson and Thomas S. Sandford April 16th, 1872, and marked reissue No. 4,870. [3] The fastening complained of consists of two plates fastened one on each side of the two rails to be connected together, and bolted by means of bolts passing through the rails and through slots in the plates. The two rails are thus securely fastened together, all change of their relative position, except in the single direction of the slots in which the bolts can slide, being prevented. while, thus, the expansion and contraction of the rails in that direction is accommodated.

In order to a proper understanding of the question to be discussed, it is necessary to call attention to the language of the reissued patent, upon which the plaintiffs' rights depend. In the title of the patent, the invention is designated as "an improvement in fastening sheet metal to roofs." In the specification. the invention is called, sometimes, "an adjustable fastening." and. sometimes, "an adjustable fastener." The only description of the invention given is in connection with its use in fastening metallic roofs to buildings, but it is stated that the fastener may be used wherever it is necessary to allow for the contraction or expansion of materials to be fastened together. The specification states, that the "principle of my invention consists in connecting the metal to be fastened with a bolt or pin arranged to slide in slotted bearings in the direction of expansion or contraction, said adjustable bolt and its bearings being combined with materials to be fastened." In connection with the description, drawings are referred to, in which, as the specification says, are indicated the screws for attaching the metallic roof to the stud—the stud—the adjusting bolt or pin, to which the metallic roof is connected by the stud and screw, said bolt passing through the stud and through the slots of the side plates or flanges—the side plates or flanges, provided with slots. which form the bearings of the adjusting bolts—the bottom plate. used as a convenient means of attaching the side plates to the wooden sheathing of the building—an india rubber cord, which may be used in applying the adjustable fastener to buildings—the screws for attaching the bottom plate. and. with it, the side plates, to the sheathing—the sheathing, greatly enlarged in thickness in proportion, to illustrate the details of the connection of the adjustable fastener to buildings—the metallic roofing. The specification. after explaining the method of using the invention, in attaching metallic roofing to buildings, goes on to say: "Both the wooden sheathing and the metallic roof are thus connected to the self-adjusting mechanism, consisting of the slotted side plates and

[3] [The original patent. No. 17,331, was granted to plaintiffs, May 19, 1857.]